IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 7:16cr35 |
| | ) | |
| | ) | All in violation of: |
| v. | ) | 21 U.S.C. § 846 |
| | ) | 18 U.S.C. § 1512(b)(1) |
| GORDON REAVES PARKER | ) | 18 U.S.C. § 1347(a)(1) |
| Defendant | ) | |

# INFORMATION

## INTRODUCTION TO THE INFORMATION

At all times material to this Information:

1. **GORDON REAVES PARKER** was a wealthy retiree.

2. Between April and May 2014, **GORDON REAVES PARKER** met HW while she was living at the Roanoke Rescue Mission. At that time, HW, age 28, was addicted to controlled substances and was on court supervision. **PARKER** provided HW money and offered her drugs in exchange for sexual activity with him. HW went to jail in May 2014 for continuing to use controlled substances while on supervision. While in jail, HW enrolled in the Roanoke City Jail Alpha drug rehabilitation program for women addicted to controlled substances. Alpha drug rehabilitation program female inmates are housed together in the jail.

3. While HW was in jail, **GORDON REAVES PARKER** stayed in contact with HW through the Roanoke City Jail telephone system established for inmate use. All calls are recorded and clearly advise both the caller and the person called that the conversations are recorded.

4. **GORDON REAVES PARKER** supplied money for HW's jail account. Funds in this account, or on an inmate's "books," can be used to purchase toiletries, snacks, radios and other approved items not supplied by the jail.

5. Over time, between May and September 2014, **GORDON REAVES PARKER,** at his request, was introduced by HW to JM and then to other female Alpha drug program inmates by phone. **PARKER** had numerous recorded telephone conversations with several of these female inmates. **PARKER** put thousands of dollars on the jail "books" of several of these women.

6. **GORDON REAVES PARKER**, in his recorded conversations with these Alpha drug program inmates, offered to be their "sugar daddy" and to take care of them when they were released from jail. Between May 2014 and the present, **PARKER** spent more than $100,000 on these women for clothing, toiletries, luxury underwear, cars, household items, fines, child support, cell phones, legal fees, and other items of value. These items were provided to these women by **GORDON REAVES PARKER** with the understanding the women would engage in sexual activity with **PARKER**.

7. **GORDON REAVES PARKER** knew all of the female inmates in the Alpha drug program were addicted to controlled substances. Using this knowledge, after

the women were released, **PARKER** offered and provided controlled substances to those women in exchange for sexual activity.

8. Since at least January 2011, **GORDON REAVES PARKER's** wife, DP, had been prescribed hydromorphone, 4 mg, (also known as Dilaudid, and "K4's"), and morphine sulfate, 30 mg, (also known as MS Contin). By at least February 2013, these controlled substances were no longer being given to DP by her personal home caregivers. However, **GORDON REAVES PARKER** continued to take DP to her pain management physician to obtain these narcotics, keeping and stockpiling these opiate controlled substances to give to women in exchange for sexual activity. On May 12, 2015, the pain management physician ended his controlled substance prescriptions to DP after learning from law enforcement that the narcotics were not being given to DP. From December 2012 to January 2015, **GORDON REAVES PARKER** obtained 2,520 hydromorphone (Dilaudid) 4 mg prescription pills that were not dispensed to DP, and 2,520 morphine sulfate (MS Contin) 30 mg prescription capsules that were not dispensed to DP. During this time, the unnecessary pain management physician office visits and controlled substance prescriptions fraudulently cost Medicare $1,262.82.

9. Some of the women **GORDON REAVES PARKER** met through the Alpha drug program preferred heroin over the prescription controlled substances **PARKER** offered to them. **PARKER** provided cash to those women to obtain heroin to use with him and in his presence prior to engaging in sexual activity. On occasion, some of the women would obtain the heroin with **PARKER's** cash for others to use.

10. In June 2014, Alpha drug program inmate JM, age 20, was introduced by phone to **GORDON REAVES PARKER** by HW. From June 2014 to her release from jail on September 25, 2014, **GORDON REAVES PARKER** talked to JM by phone numerous times, describing controlled substances and syringes that he could provide to her upon her release from jail and describing sexual activities they would perform. **GORDON REAVES PARKER** provided more than $2,000 to JM on her jail account. Shortly after her release from jail in September 2014, JM finally met **GORDON REAVES PARKER** in person. Between September 2014 and October 2014, **PARKER** provided approximately 60 Dilaudid (hydromorphone) pills to JM and supplied the syringes for JM to inject these pills intravenously.

11. JM visited **GORDON REAVES PARKER** at his two homes on numerous occasions between November 2014 and February 2015. On these occasions JM used controlled substances supplied by **GORDON REAVES PARKER** and engaged in sexual activities with **PARKER**. In January 2015, **PARKER** gave JM $150 to buy heroin, which she used for the first time. JM went back to jail from February 2015 to May 2015. Upon her release from jail, JM went with BH to **GORDON REAVES PARKER's** home on Rockbridge Court to use controlled substances provided by **PARKER**.

12. SR, age 18, was introduced to **GORDON REAVES PARKER** by HW by phone while SR was an inmate in the Alpha drug rehabilitation program at the Roanoke City Jail. Between July 29, 2014, the day SR was released from jail, and September 19, 2014, **GORDON REAVES PARKER** distributed at least twelve (12) Dilaudid

(hydromorphone), 4 mg, tablets and eight (8) morphine sulfate capsules to SR knowing that she was a recovering addict. In addition, **GORDON REAVES PARKER** supplied SR with more than $5,000 to purchase heroin. SR was expected to, and did, engage in sexual activity with **GORDON REAVES PARKER** in exchange for the controlled substances. **PARKER** told SR that if she did not do as he asked he would show a video of SR shooting drugs to her probation officer.

13. In August 2014, while still in jail, JM introduced **GORDON REAVES PARKER** to fellow Alpha inmate, BH, age 25, through telephone calls at the Roanoke City Jail. From August 2014 to December 2014, while she was in jail, **GORDON REAVES PARKER** put more than $5,000 in the jail account for BH. **GORDON REAVES PARKER** picked BH up when she was released from jail in December 2014, and she went to live with **PARKER**. **GORDON REAVES PARKER** provided her with numerous Dilaudid pills and provided syringes for her use in injecting the Dilaudid. In January 2015, **GORDON REAVES PARKER** told BH the Dilaudid pills had run out and **PARKER** gave cash to JM to purchase heroin for BH. From January 2015 to May 2015, **GORDON REAVES PARKER** supplied thousands of dollars to JM and another woman to purchase heroin for BH. During that time, BH used 3 bundles (3 grams) of heroin a day supplied by **GORDON REAVES PARKER** on more than 30 days (90 grams). **GORDON REAVES PARKER** expected and received sexual activity from BH after giving her the controlled substances.

14. In September 2014, while BH was still in jail, and before she had met **PARKER** in person, **GORDON REAVES PARKER** devised a plan to lie to the Circuit

Court for the County of Rockbridge about **PARKER's** previous employment of BH to care for his wife. **GORDON REAVES PARKER** and BH discussed the plan using the Roanoke City Jail phone system both before and after the perjured testimony. **PARKER** and BH are currently charged in Rockbridge County with perjury and conspiracy to commit perjury.

15. In October 2014, **GORDON REAVES PARKER** was introduced to BR, age 23, by JM. BR was a prior Alpha drug program graduate. Over the course of a week, **PARKER** gave BR 50 Dilaudid pills and syringes with the expectation that BR would engage in sexual activity with him. As a result, BR did not pass a urine drug screen and went back to jail on October 31, 2014. Prior to that week, BR had not used drugs since her release from jail on September 9, 2014. BR was released from jail again on November 8, 2014 and on December 25, 2014, she went to **GORDON REAVES PARKER's** home where he gave BR eight (8) oxycodone tablets and three (3) hydrocodone (Lortab) pills and they engaged in sexual activity. After that night, when BR did not keep in touch with **PARKER**, he sent BR a text message threatening to interfere with her employment and to cut off her phone if she did not answer his texts.

16. While in jail in the Alpha drug program, KK, age 27, was introduced by phone to **GORDON REAVES PARKER**. Upon her release from jail in October 2014, KK visited **PARKER** numerous times at his Wipledale Avenue residence. **PARKER** provided KK with controlled substances and with cash to buy additional controlled substances in exchange for sexual activity with **PARKER**.

17. In October 2014, JM took AU, age 27, to **GORDON REAVES PARKER**'s residence. **GORDON REAVES PARKER** gave AU Dilaudid. Over the next month, AU went to **GORDON REAVES PARKER**'s residence two to three times a week and obtained Dilaudid and engaged in sexual activity. **PARKER** also gave her cash to buy heroin and methamphetamine.

18. In November 2014, KC, age 27, was introduced to **GORDON REAVES PARKER**. From November 2014 to January 2015, KC went to **PARKER's** Rockbridge Court home on more than twenty occasions, where she was provided with morphine, Dilaudid and heroin by **PARKER**. She also engaged in sexual activity with **PARKER**.

19. HF was in the Alpha drug rehabilitation program with JM. JM introduced HF to **GORDON REAVES PARKER** while they were in jail. **PARKER** put money on her jail account. In November 2014, HF was released from jail and went to **GORDON REAVES PARKER**'s residence the next day where **PARKER** gave her Dilaudid pills, syringes for injecting the Dilaudid, and $3,000 for sexual activity. This activity continued daily or every other day for approximately two weeks.

20. While in jail in the Alpha drug program, CC, age 27, was introduced by phone to **GORDON REAVES PARKER** by BH. Upon her release in November 2014, CC met with **GORDON REAVES PARKER** and he provided her with controlled substances, including approximately 50 Dilaudid pills and syringes for her use. CC went back to jail and was released in August 2015. CC again contacted **GORDON REAVES PARKER**. **PARKER** supplied her with $400 to $500 on numerous occasions for her to purchase heroin. In approximately October 2015, CC began treatment at the methadone

clinic with **PARKER** paying $105 per week for the treatment. From October 2015 to March 2016, and while continuing to pay for methadone treatment for CC, **GORDON REAVES PARKER** also provided CC with Opana, morphine, Lortab and cash for purchasing heroin. In addition, **GORDON REAVES PARKER** paid CC $1,000 per week for a period of time. The money and controlled substances were supplied to CC for engaging in sexual activity. After September 30, 2015, **GORDON REAVES PARKER** understood that he was not to have contact with potential federal witnesses, including CC. However, **GORDON REAVES PARKER** continued to have contact with CC and continued to provide her with controlled substances until at least March 2016.

21. Around November 29, 2014, **GORDON REAVES PARKER** supplied his credit card for JM, HF, CC, and KC to use on a $3,000 shopping trip.

22. In January 2015, LB, age 27, met **GORDON REAVES PARKER** through BH. Over a two week period from January to February 2015, LB went to **PARKER**'s residence every day and was provided morphine, Lortab, and heroin by **PARKER**. For two consecutive days, LB went with KC to **GORDON REAVES PARKER**'s Rockbridge Court home, using heroin and crack cocaine paid for by **PARKER** and engaged in sexual activity with **PARKER**.

23. In August 2015, **GORDON REAVES PARKER**, JM, HW and BH were charged with sexually based offenses and arrested in Roanoke County. **PARKER** paid the bond for JM's release. **PARKER**, on bond and knowing that he was to have no contact with his co-defendants, bought both himself and JM "burner" cell phones from Walmart using South Dakota area codes. In August 2015, **GORDON REAVES**

**PARKER,** while on bond in Roanoke County, also provided JM with controlled substances and cash for heroin and methamphetamine.

24. On September 3, 2015, SN was subpoenaed to the federal Grand Jury to testify about the controlled substances dispensed to **GORDON REAVES PARKER's** wife, DP. SN was employed by **PARKER** as a "med tech" to sort, and place in baggies, the daily medications for DP and **GORDON REAVES PARKER.** SN had been previously interviewed by law enforcement investigators on April 21, 2015, wherein SN advised that she had not dispensed morphine sulfate or Dilaudid (hydromorphone) to DP in more than a year and a half. At her federal Grand Jury appearance, SN's testimony was significantly different, wherein she testified under oath that DP had been given twice the Dilaudid dose in October 2014 and weaned down through March 2015. SN testified that the Dilaudid was doubled at **GORDON REAVES PARKER's** direction:

> A. As I said, Mr. Parker was her guardian, and he dictated everything that was done. How much she was walked, how much, and he said, we're going to do this now, and I did it. It might not have been a wise choice on my part to follow his directions, but I did. Declined the medicine the way he asked to be done.

SN was advised that her testimony could be construed as obstruction of justice and she was advised to consult with her attorney, who was provided by **GORDON REAVES PARKER.**

25. SN, after discussion with her attorney and the United States, returned to the federal Grand Jury on September 17, 2015, and testified that she had not been honest with the Grand Jury previously. When asked if she had spoken to **GORDON REAVES PARKER** about her Grand Jury testimony before she appeared on September 3, 2015,

Page **9** of **15**

Case 7:16-cr-00035-EKD   Document 1   Filed 06/20/16   Page 9 of 15   Pageid#: 9

and what **PARKER** had advised her to say, she testified as follows:

> A. I was, before I met with my attorney, before I met with my attorney, I was over at the house. Gordon called me into his, his bedroom. He sat on the bed. I sat in the chair. And he said, "We need to, we need to make this work. You, you doubled, you doubled up and dispensed down her Hydromorphines (sp).
>
> ……
>
> A. He [**PARKER**] said that we need to make this right, that you dispensed down, you doubled up and dispensed down the Dilaudid. And I said what I told the detectives was the truth. I don't remember his exact reply, but in reference to that didn't matter. And that was when I made the wrong decision.
>
> ……
>
> A. [**PARKER** said] "We need to make this work. We can say we doubled them up, say you doubled them up and dispensed them down until they're gone."

26. EI, caregiver for DP, also testified before the federal Grand Jury on September 3, 2015. EI cared for DP in **GORDON REAVES PARKER**'s Wipledale Avenue home until the summer of 2014, when DP was moved to EI's home down the same street on Wipledale. EI testified that she had weaned DP off all the controlled substances before DP moved to EI's home and that no controlled substances were provided to DP while she resided in EI's home.

# COUNT ONE
(Conspiracy to Distribute Schedule II Controlled Substances, 21 U.S.C. § 846)

The United States Attorney charges:

1. The allegations set forth in the Introduction to this Information are incorporated herein by reference.

2. Between on or about May 2014 and continuing to the present, in the Western District of Virginia, **GORDON REAVES PARKER** knowingly and intentionally combined, conspired, confederated and agreed together with JM, and BH, and with each other, and with other persons known and unknown, to commit the following offenses against the United States: to distribute a mixture and substance containing hydromorphone, a Schedule II narcotic controlled substance; to distribute a mixture and substance containing morphine sulfate, a Schedule II narcotic controlled substance; and, to distribute a mixture and substance containing heroin, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C).

3. It was part of the conspiracy that **GORDON REAVES PARKER** solicited contact with drug addicted women in the Roanoke City Jail Alpha drug rehabilitation program and then distributed controlled substances to them upon their release expecting to engage them in sexual activity. It was further part of the conspiracy that **GORDON REAVES PARKER** distributed controlled substances to some of the women who then further distributed the controlled substances to others. It was further part of the

conspiracy that **GORDON REAVES PARKER** provided cash to some of the women to purchase heroin for subsequent distribution to **PARKER** and others.

4.  All in violation of Title 21, United States Code, Section 846 and 841(a)(1) and (b)(1)(C).

## COUNT TWO
(Tampering with a Witness, 18 U.S.C. §1512(b)(1))

The United States Attorney charges:

1.  The allegations set forth in the Introduction to this Information are incorporated herein by reference.

2.  Between on or about August 26, 2015, and on or about September 3, 2015, in the Western Judicial District of Virginia, the defendant, **GORDON REAVES PARKER**, did knowingly corruptly persuade SN, with the intent to influence the testimony of SN in an official proceeding, by convincing her to testify falsely, under oath, before the federal Grand Jury investigating his criminal conduct about the prescription controlled substances given to DP.

3.  In violation of Title 18, United States Code, Section 1512(b)(1).

## COUNT THREE
(Health Care Fraud, 18 U.S.C. §1347(a)(1))

The United States Attorney charges:

1.  The allegations set forth in the Introduction to this Information are incorporated herein by reference.

2. Between January 2013 and November 2015, in the Western District of Virginia and elsewhere the defendant, **GORDON REAVES PARKER**, did knowingly and willfully execute and attempt to execute, a scheme and artifice to defraud a federal health care benefit program, as defined in Title 18, United states Code, Section 24(b), and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, or under the custody and control of, a health care benefit program that is, Medicare, in connection with the delivery of or payment for health care benefits, items and services.

3. Specifically, **GORDON REAVES PARKER** knowingly sought and fraudulently obtained unnecessary specialty pain management physician medical services and fraudulently obtained unnecessary controlled substance prescriptions for his wife, DP, all paid for by Medicare.

4. All in violation of Title 18, United States Code Section 1347.

## NOTICE OF FORFEITURE

1. Upon conviction of one or more of the felony offenses alleged in this Information, the defendant shall forfeit to the United States:

> a. any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of said offenses, pursuant to 21 U.S.C. § 853(a)(1).
>
> b. any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of said offenses, pursuant to 21 U.S.C. § 853(a)(2).

Page **13** of **15**

Case 7:16-cr-00035-EKD   Document 1   Filed 06/20/16   Page 13 of 15   Pageid#: 13

2. The property to be forfeited to the United States includes but is not limited to the following property:

    a.    **5609 Rockbridge Court, Roanoke, VA 24018**
           **Parcel ID: 087.19-10-10.00-0000**

All that certain lot or parcel of land situate in the County of Roanoke, Commonwealth of Virginia, and being more particularly described as follows:

Lot 10, as shown on the plat entitled "Plat of Survey Showing the Subdivision of Property for Chantilly Partners of Roanoke, LLC, recorded as Instrument No. 200619493 to Be Known as Chantilly Place," dated January 15, 2007, prepared by Brian J. Casella, Land Surveyor, recorded in the Clerk's Office of the Circuit Court for the County of Roanoke, Virginia, as Instrument No. 200711650.

TOGETHER WITH a non-exclusive right of ingress and egress over the private roads, as set forth in the Declaration of Covenants, Conditions and Restrictions of Chantilly Place Homeowners Association dated January 22, 2008, record in the aforesaid Clerk's Office as Instrument No. 200801037. BEING a portion of the same property conveyed to Chantilly Partners of Roanoke, LLC, a Virginia LLC, by deed dated April 5, 2006, from Cindy Michelle Dudding and Gail Sheree Dudding Wood, recorded in the Clerk's Office of the Circuit Court for the County of Roanoke, Commonwealth of Virginia, as instrument No. 200619492 and Instrument No. 200619493.

BEING the same property conveyed to Gordon R. Parker from Chantilly Partners of Roanoke, LLC, a Virginia Limited Liability Company by Deed dated April 10, 2014, and recorded in the Circuit Court Records of Roanoke County, Virginia, on April 17, 2014, as Instrument No. 201403187.

    b.    **5164 Wipledale Avenue, Roanoke, VA 24019**
           **Parcel ID: 037.13-02-21.00-0000**

Lot 19, Block 8, as shown on the Map of Section No. 2, North Lakes, made by David Dick and Harry A. Wall, C. E. & S., dated August 17, 1965, of record in the Clerk's Office of the Circuit Court of Roanoke County, Virginia, in Plat Book 6, Page 56; and

BEING the same property conveyed to Carolyn H. McArthur by deed from Eugene C. Winston and Mary B. Winston, husband and wife, dated May 29, 1974 of record in the Clerk's Office aforesaid in Deed Book 998, page 84.

BEING the same property conveyed to Gordon R. Parker and Delores A. Richards Parker by deed from Carolyn H. Barrett (who took title as Carolyn H. McArthur) and Richard E. Barrett, dated December 9, 1975 of record in the Clerk's Office of the Circuit Court of Roanoke County, Virginia in Deed Book 1033, pages 85-90.

3. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with a third person;
   c. has been placed beyond the jurisdiction of the Court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek forfeiture of any other property of the defendant up to the value of the above-described forfeitable property, pursuant to 21 U.S.C. § 853(p).

_____      6/17/16
JOHN P. FISHWICK, JR.                  Date
UNITED STATES ATTORNEY